UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Case No.: 15-cv-06992
(SJF)(GRB)

--------------------------------------------------------------------X

MARY ELLEN WEAVER, DAVID SLOVER,
LACEY BRANKER, RAYMOND PATUANO, and
DONNA SHEPROW

**SECOND
AMENDED
VERIFIED
COMPLAINT**

Plaintiffs,

JURY TRIAL DEMANDED

-against-

RIVERHEAD CHARTER SCHOOL and RAYMOND
ANKRUM,

Defendants.

--------------------------------------------------------------------X

Plaintiffs by their attorneys, **DELL & DEAN, PLLC**, complaining of the Defendants

respectfully sets forth and alleges as follows:

## NATURE OF CASE

1)      This is an action for monetary damages and other redress brought by the Plaintiffs

against the Defendants for unlawful racial discrimination, gender discrimination, age

discrimination, sexual harassment, third-party sexual harassment, and retaliation in violation of

New York State Law, namely Article 15 §§ 290 et seq of the Executive Law, also known as the

New York State Human Rights Law, (hereinafter, "NYSHRL"), in violation of United States

law, namely 42 U.S.C. § 1981 (hereinafter, "§ 1981"), 42 U.S.C. § 1983, and for negligent

hiring, wrongful termination, and illegal employment practices, and for any other cause(s) of

action that can be inferred from the facts set forth herein.

## PARTIES

2)      Plaintiff, MARY ELLEN WEAVER, is a female citizen of Suffolk County, New

York. At all times relevant, Plaintiff was employed by Defendant RIVERHEAD CHARTER

SCHOOL, under the direct supervision of her supervisor, Defendant, RAYMOND ANKRUM.

At all times relevant herein, Plaintiff was an "employee" within the meaning of NYSHRL and § 1981.

3)       Plaintiff, DAVID SLOVER, is a male citizen of Suffolk County, New York. At all times relevant, Plaintiff was employed by Defendant RIVERHEAD CHARTER SCHOOL, under the direct supervision of his supervisor, Defendant, RAYMOND ANKRUM. At all times relevant herein, Plaintiff was an "employee" within the meaning of NYSHRL and § 1981.

4)       Plaintiff, LACEY BRANKER, is a female citizen of Suffolk County, New York. At all times relevant, Plaintiff was employed by Defendant RIVERHEAD CHARTER SCHOOL, under the direct supervision of her supervisor, Defendant, RAYMOND ANKRUM. At all times relevant herein, Plaintiff was an "employee" within the meaning of NYSHRL and § 1981.

5)       Plaintiff, RAYMOND PATUANO, is a male citizen of Suffolk County, New York. At all times relevant, Plaintiff was employed by Defendant RIVERHEAD CHARTER SCHOOL, under the direct supervision of his supervisor, Defendant, RAYMOND ANKRUM. At all times relevant herein, Plaintiff was an "employee" within the meaning of NYSHRL and § 1981.

6)       Plaintiff, DONNA SHEPROW, is a female citizen of Suffolk County, New York. At all times relevant, Plaintiff was employed by Defendant RIVERHEAD CHARTER SCHOOL, under the direct supervision of her supervisor, Defendant, RAYMOND ANKRUM. At all times relevant herein, Plaintiff was an "employee" within the meaning of NYSHRL and

7)       Upon information and belief, at all times relevant, Defendant RIVERHEAD CHARTER SCHOOL was and still is a domestic corporation, foreign corporation, or other legal entity duly organized and existing under and by virtue of the laws of the State of New York.

Upon information and belief, RIVERHEAD CHARTER SCHOOL maintained a principal place of business in the County of Suffolk, and State of New York. Defendant RIVERHEAD CHARTER SCHOOL employed Plaintiffs at all relevant times. At all relevant times herein, Defendant RIVERHEAD CHARTER SCHOOL is an "employer" and/or a "person" within the meaning of NYSHRL and § 1981.

8)  Upon information and belief, Defendant, RAYMOND ANKRUM, is a citizen of New York. Defendant, RAYMOND ANKRUM was at all times relevant to this matter an employee of Defendant, RIVERHEAD CHARTER SCHOOL, and/or was a "person" and/or an "agent" of Defendant, RIVERHEAD CHARTER SCHOOL, within the meaning of NYSHRL and § 1981. Defendant RAYMOND ANKRUM was at all times relevant to this matter Plaintiffs' supervisor and/or manager and was empowered by RIVERHEAD CHARTER SCHOOL as a distinct class of agent to make tangible economic decisions affecting the Plaintiffs.

9)  Each Defendant herein was acting as an employee and/or agent for each other Defendant herein and as such each is vicariously liable for the acts of others.

## FACTS COMMON TO EACH INDIVIDUAL CAUSE OF ACTION

10)  At all times relevant, Plaintiffs were employed by Defendant, RIVERHEAD CHARTER SCHOOL. Defendant, RAYMOND ANKRUM, was appointed the position of Principal in approximately August 2012. Defendant, RAYMOND ANKRUM, as such, was otherwise a "person" and/or an "agent" of Defendant, RIVERHEAD CHARTER SCHOOL, within the meaning of NYSHRL and § 1981. Defendant RAYMOND ANKRUM was at all times relevant to this matter Plaintiffs' supervisor and/or manager and was empowered by RIVERHEAD CHARTER SCHOOL as a distinct class of agent to make tangible economic decisions affecting the Plaintiffs.

11)     Shortly after Defendant, RAYMOND ANKRUM's (hereinafter, "MR. ANKRUM") hire, he began instituting changes within the Defendant, RIVERHEAD CHARTER SCHOOL, (hereinafter, "RCS" or the "School").

12)     MR. ANKRUM is an African-American male, known to be intelligent, calculated, and perpetrating an ostensibly noble agenda of improving minority education at RCS. In reality, MR. ANKRUM's agenda was the product of his racist, ageist, sexist, and other discriminatory beliefs. MR. ANKRUM illegally made these atrocious beliefs part of the terms of employment at Defendant, RIVERHEAD CHARTER SCHOOL, in violation of NYSHRL and § 1981. MR. ANKRUM carried out this agenda to improve minority education by removing the Plaintiffs – the older, Caucasian, female teachers - from the school, and replacing them with younger teachers, whom he found attractive, and whom he could more easily manipulate into furthering his discriminatory agenda.    MR. ANKRUM's discrimination was directed at parents and students as well.

13)     MR. ANKRUM maintained a Twitter account, using the handle "@RayQRubio". Upon information and belief, MR. ANKRUM's Twitter account was deleted following the commencement of Complaints within the New York State Division of Human Rights in approximately 2014.

14)     Many of MR. ANKRUM's tweets are downright and arrogantly racist, promoting his own personal agenda to improve the lives of minorities. Of itself, one may say the strive for equality is certainly noble. However, MR. ANKRUM's tweets evince his tendency to, at best, generalize based on protected classes (race); form superficial, racially-charged and racially-based opinions; and his prejudicial belief that race, naturally or "nurturally", plays any role in a person's fundamental perceptions, abilities, thought processes, and the like. Further, MR.

ANKRUM boldly and publicly conveys his distaste for Caucasians and whatever societal advantages may or may not exist for them.

15) Examples of MR. ANKRUM's racist tweets under the Twitter user name "@RayQRubio" include: "@Dhdapostman @notcompton now it's time to pull out the black card"; "Ways to combat low T: #1. Date hot chicks. #2 Get an annual check-up #3. #Ting #4. Strip clubs & dollar bills"; "So it takes the #firstlady to attend a funeral to get investigators in #Chicago to care about black kids?"; "@Logicalhater @YoungMiddleEric dude, clearly race is playing a role in this. #dorner #lapd"; "I hate negro twitter. #theend"; "@QLegacy_Uplift gotta be the most ignorant self-hatred tweet I have ever seen. And you're a darkie…"; "**White male privilege is really something in the good ole United States #livestrong**" (emphasis added); "Sad that in 2013, Gifted + talented = separate + unequal http://shar.es/4DiEA via @JoanneLeeJacobs #diversity"; "W.E.B. Dubois was such a forward thinker. I wonder if he envisioned the state of the negro would forever be abysmal?"; "And every young black kid who exhibits anger or a lack of attention to your teaching is ADHD. #teachdontdiagnose"; "**@MoniseLSeward absolutely. But they never want to acknowledge that they suck as teachers and they can't make connections with black kids.**" (emphasis added)**; "...coonedouttwitterbase"** (emphasis added)**; "Is there an exclusive invitation to white twitter?"** (emphasis added)**; "no way a black man would get the opportunity to explain his situation like this foolishness on #dateline"** (emphasis added)**; "…so is RGIII an Uncle Tom or naa?"** (emphasis added)**; "Rob Parker got a raw deal. RGIII is an Uncle Tom or naa?"** (emphasis added)**;** "nigga said you use to have wild wrong dude sex…@MR845HIMSELF"; "Romney is #Mexican…"; and "#Mittprivilege". More specifically, MR. ANKRUM is of the

belief that Caucasian teachers are innately unable to, and therefore should not, teach minority children.

16)     MR. ANKRUM's tweets also display arrogantly a deep-seated, albeit sometimes subtle, misogyny. MR. ANKRUM's tweets evince his tendency to, at best, generalize based on protected classes (gender/sex); form superficial, gender-charged and gender-based opinions; and his prejudicial belief that women, as a class of people, act with some degree of predictability and uniformity. He also boldly objectifies women, discussing his anatomical aesthetic preferences, his frequency of strip clubs, and various other degrading proclamations.

17)     Examples of MR. ANKRUM's discriminatory and misogynistic tweets under the Twitter user name "@RayQRubio" include: "...& light skinned ugly chicks are uglier than dark skinned ugly chicks.[1]"; "I'm moving to South Africa immediately bro. What in the Nike? What in the prosthetic is going on with the judicial system in SA?[2]"; "threesome?"; "Willing to wager an unattractive girl w/ a designer bag has better credit than an attractive girl w/ a designer bag."; "non attractive girls w/ designer bags present quite the conundrum"; "**...it's gone now. I likes me _____ nice & round, I likes me _____ to go up & down**" (emphasis added); "Ways to combat low T: #1. Date hot chicks. #2 Get an annual check-up #3. #Ting #4. Strip clubs & dollar bills"; "#ah is a size 2. #ak is teetering into double digits, size 9.5. Some say thick, I say cottage cheese"[3]; "...it all started with #RoyceWhite bro. You bone her raw, your iq is below 40."; "...Insecurity is a women's worst enemy..."[4]; **"Control-yo-hoes-you-let-her-talk-to-youcrazy-you-got-baby-mama-drama-you-aint-even-got-you-no-baby"; "Watching the Grammy's in**

---

[1] Note this tweet reveals MR. ANKRUM's preference for darker-skinned women *and* reveals his discriminatory and misogynistic nature.
[2] a reference to MR. ANKRUM's apparent satisfaction the news of the day of February 22, 2013, that Oscar Pastorious, despite being charged with murder, was released on bail after shooting and killing a woman
[3] MR. ANKRUM's reference to women and their dress sizes. He refers to overweight women crudely as "cottage cheese."
[4] Referencing MR. ANKRUM's views as to how women *should* be.

3d. Does jlo have the ill pouch or na? I'd still whip tho." "use the kings' English when you address me woman"; "If I ever get married, I'm not using the excuse weddings are expensive, I'll tell you I didn't want you there bc you suck as a person."; "& dudes if a woman is in an uproar when you say #prenup, it reinforces my theory that she's bringing nothing to the table. #run"; "& ladies when you find Mr. Right, your homegirls aren't happy for you. They want you to be divorced. #miserylovescompany"; "<u>More male educators are needed. #theend</u>"; "@LogicalHater we would've got whipped. @MarkDark2399 was bitching up…"; "…Philly strip clubs be having wild two for ones. I'm coming to bang w/ you… #soon b4 y'all go OD w/ this big 10."; "@_Thx4Playin@HotChoqlate don't feed the stray cats with compliments. They will never leave."; "Her: sex changes things. Me: Yep, for the better. Her: a-hole. Me: in your a-hole? No problem…Ha, I kill me. ~Alf."; and "She better take her as to Zumba today. Fdat bro." (emphasis added).

18)    More specifically, MR. ANKRUM believes that female teachers are ineffective.

19)    Quite disturbingly and alarmingly, MR. ANKRUM boldly proclaims on Twitter "**More male educators are needed. #theend**" (emphasis added).

20)    In addition to his racist and misogynistic rhetoric, MR. ANKRUM is prone to homophobic slurs as well. Examples of MR. ANKRUM's discriminatory and misogynistic tweets under the Twitter user name "@RayQRubio" include: "Miles Austin is either on peds, or he's a faggot…".

21)    MR. ANKRUM is proud of his intelligence, noting often that his tweets tend to be "over [other users'] heads". Further, he tweets with a stubborn arrogance and narcissism that, together with his repeated announcements of his educated status, evinces MR. ANKRUM's

tendency to act in a calculated manner. Examples of MR. ANKRUM's discriminatory and misogynistic tweets under the Twitter user name "@RayQRubio" include: '…yes, but I graduated from stony brook, have an ivy league Ed.M, and I'm in a top 50 doctoral program. How dare you dude?"; "I would like to thank the tier 1 universities that I have attended for teaching me how to speak…"; "bro, I am the team. I don't need to acclimate to the bs."; "I will not dumb down my tweets for you minions."; "…Nelson please, you're a journeyman, you'll never outwit me bro. I don't take your kind serious…"; **"I have to limit who has access to my brilliance."** (emphasis added); "I realize my tweets go way over the heads of most, it's fine, you can thank me when you get it. Could be months, even years."; and "I hate dumb people. People who ride the "Jerry Buss" or is it the "yellow bus", either way you're an idiot".

22)     Shortly after MR. ANKRUM's hire, in approximately August 2012 at a "Back to School Barbecue," MR. ANKRUM had a conversation with a very-well-liked social worker at the school named LACEY BRANKER (hereinafter, "MS. BRANKER"). MS. BRANKER and MR. ANKRUM had a discussion in which MR. ANKRUM asked MS. BRANKER what her opinion was of MR. ANKRUM. MS. BRANKER indicated that she had only recently met him and was not sure. MR. ANKRUM replied "I know, I'm an asshole. I own it." MS. BRANKER was unsure how to respond, but replied, "I guess that's true."

23)     Shortly thereafter, MR. ANKRUM held a staff meeting in which he indicated that he "feels like a minority" because he "inherited" an "all-white staff." Immediately upon MR. ANKRUM's hire, Caucasian Plaintiffs learned there would be a tension between them and MR. ANKRUM based upon their race.

24)     Early into MR. ANKRUM's hire, he was noted to make statements such as "we need new blood around here," "the old guard needs to change," "we need more color in the

building," "I feel like a minority here," "we need more males here," "we need more black males here."

25)     In approximately September/October of 2012, there was a meeting of the Student Support Team in the Board Room. During the meeting, criticisms of MR. ANKRUM's new regime were discussed. One of the criticisms with MR. ANKRUM was that teachers were made to feel uncomfortable that he often requested that they "write up" untrue things about students.

26)     Following the meeting, MR. ANKRUM exclaimed toward MS. BRANKER, "I HATE THIS FUCKING SCHOOL! I CAN'T WAIT UNTIL NEXT YEAR, I'M HIRING ALL YOUNG, SKINNY GIRLS WITH SHORT DRESSES." MS. BRANKER said to MR. ANKRUM, "I guess I won't make the cut, then?" MR. ANKRUM said, "I'll leave that up to you to figure out."

27)     On one occasion, there was a handicapped Caucasian child having difficulty in school. MS. BRANKER, as the social worker, discussed the child with MR. ANKRUM. MR. ANKRUM wanted the child out of the school. MS. BRANKER wanted to help the child. MR. ANKRUM stated, "I'm not feeding into his disability. I'm not having a school full of freaks." MS. BRANKER was extremely disturbed by MR. ANKRUM's discrimination.

28)     On another occasion, there was a situation involving a Caucasian woman with an adopted African-American daughter. MR. ANKRUM was disturbed by a Caucasian woman attempting to raise an African-American child. The child suffered from anxiety. In a meeting with the mother, MR. ANKRUM told her that she was a "poor parent" and that she "should not have children." MR. ANKRUM's distasteful words were motivated by his racist beliefs.

29)     On another occasion, a Caucasian student was complaining of being bullied by two African-American students. MR. ANKRUM was known to be friends with the African-

American mother of the two African-American children. The teacher of the children corroborated the story, and confirmed that the Caucasian girl was being bullied by the two African-American students. MR. ANKRUM tried to sweep the incident under the rug. MR. ANKRUM ordered the teacher to modify her report to indicate that the two African-American children were being bullied by the Caucasian student. The teacher was appalled and refused to be a part of such a fabrication. Again, MR. ANKRUM's actions were motivated by his racist beliefs and his attempts to protect the African-American children in a discriminatory manner over the Caucasian children.

30) On another occasion, a teacher was reporting the repeated absences of two African-American children. Upon information and belief, MR. ANKRUM modified the attendance reports of these children in order to indicate that their absences were excused. MR. ANKRUM's actions were motivated by his racist beliefs and his attempts to protect African-American children in a discriminatory manner over the Caucasian children.

31) On another occasion, MR. ANKRUM allowed a particular student to go without mandated special-education services without the consent of the parent. MR. ANKRUM wanted this particular student out of RCS. The child's teacher, Mr. RAYMOND PATUANO, was aware of MR. ANKRUM's determination to rid the school of this child. MR. ANKRUM and Mr. Davidson told MR. PATUANO to "do whatever you can to get [the child] out" and "do whatever you can to 'set [the child] off'". "Set him off" referred to MR. ANKRUM and Mr. Davidson instructing MR. PATUANO to attempt to intentionally trigger the child's behavioral disorders. MR. ANKRUM said to MR. PATUANO, "you have my full support". MR. ANKRUM stated that he was trying to create a paper trail of behavioral incidents in order to justify the child's

removal from the school. MR. PATUANO was shocked at the nefarious nature of such an order and declined to treat the student in this way.

32) On numerous occasions, MS. BRANKER had conversations with Mr. Eric Davidson, in which Mr. Davidson said "MR. ANKRUM wants more black people here."

33) In approximately September 2012, DAVID SLOVER, an administrator, and MS. BRANKER were standing in the parking lot with MR. ANKRUM when a Caucasian parent with an Autistic child walked near them. MR. ANKRUM explained to MR. SLOVER and MS. BRANKER, "my biggest issue with this school is that parents with disabled kids continue to procreate." MS. BRANKER responded to MR. ANKRUM by stating "I can't believe you would say something like that." MR. ANKRUM appeared very agitated by the fact that Plaintiff did not agree with his unfairly prejudicial and discriminatory beliefs. MR. ANKRUM appeared to be "out to get" MS. BRANKER after this day. When MR. SLOVER tried to stand up for and/or defend MS. BRANKER to MR. ANKRUM, MR. ANKRUM became agitated with MR. SLOVER.

34) MR. ANKRUM also stated "another problem is that parents should not be having kids after a certain age." Plaintiffs learned very early into MR. ANKRUM's hire that he was against Caucasians, Caucasians with disabilities, and older people. Shockingly, MR. ANKRUM's feelings spread to the children, and not just the Plaintiff-employees.

35) In approximately October 2012, MR. SLOVER heard MR. ANKRUM on the phone on the porch to the Kindergarten-third grade building during school hours. MR. SLOVER heard MR. ANKRUM saying "my professional advice to you is; keep yo [sic] dick out dat [sic] pussy. You asked my advice and that's my professional advice. Keep yo [sic] dick out dat [sic]

pussy." Plaintiff was surprised that the Principal of an elementary school would use that kind of language, and was even more surprised that he would do so in the earshot of the children.

36)     In approximately December of 2012, RCS held a Saturday "retreat" for all staff members. A "facilitator" led the retreat. In the second half of the day, the facilitator asked everyone about whether they had any issues with the board and the administration. The retreat was supposed to be geared towards helping the school "move forward." The room was very quiet. MR. SLOVER, acknowledging the fact that the staff might be reluctant to speak up with the administration in the room, suggested that the Board and the Administration, including MR. SLOVER, step out of the room to allow for the free exchange of ideas and constructive criticism from the staff. MR. ANKRUM was visibly upset by this suggestion and left the room in an agitated manner. A few hours later, MR. SLOVER received a call from MR. ANKRUM, in which MR. ANKRUM stated "How the hell do I not take this personally?" MR. ANKRUM could not understand how MR. SLOVER did not take offense to it himself. MR. SLOVER stated that change is a process and that this was best for the school. MR. ANKRUM stated that he would have to think about it and calm himself down.

37)     MS. BRANKER, along with other Plaintiffs, was very vocal during this retreat. She explained to the facilitator that she found MR. ANKRUM to commonly use physical intimidation tactics. She complained that MR. ANKRUM was very calculated in the way he held teacher's jobs over their heads. He prayed on the teachers that were going through difficult times and desperately needed their jobs. He used these weaknesses in order to secure their alliances with him. MS. BRANKER also complained that MR. ANKRUM was decidedly unfair to children with disabilities. MS. BRANKER complained of discrimination, including disparate

treatment of Caucasians and African-Americans, and a hostile work environment caused by severe and pervasive sexual harassment and unlawful discrimination and retaliation.

38)     Within a few minutes after the retreat was finished, MR. SLOVER began receiving telephone calls from team leaders that were upset. The team leaders stated that MR. ANKRUM called threatening them that their jobs would be in jeopardy if they did not inform him as to what criticisms were lodged at the retreat.

39)     Approximately that following Monday, MR. ANKRUM entered a "workout" at RCS and stated to all the teachers and staff present: "Anybody who doesn't want to work here can get the hell up on outta [sic] here". He stated that if he found out who was saying negative things, he would "make their lives a 'living HELL'" with great emphasis on the word "hell."

40)     Following the retreat, MR. ANKRUM found out that MS. BRANKER was complaining about his illegal employment activities. MR. ANKRUM also learned that another teacher, Ms. MARY ELLEN WEAVER (hereinafter, "MS. WEAVER"), was in agreement with MS. BRANKER's complaints. He retaliated against them by "setting up a new office" immediately outside the classroom that MS. WEAVER and MS. BRANKER used. MR. ANKRUM told MS. BRANKER, "I can't trust you because you're talking bad about me." MR. ANKRUM told MS. BRANKER, "I'll get rid of you first before you get rid of me." MR. ANKRUM used this second "office" as a means by which to antagonize, menace, and intimidate MS. BRANKER and MS. WEAVER in retaliation for their objections to his illegal employment practices.

41)     In approximately November/December 2012, MR. SLOVER took a short leave in order to travel to Nebraska to donate bone marrow to his ailing sister, who was suffering from leukemia. Due to physical, emotional, and mental exhaustion following taking the long trip to

donate bone marrow to his sister, MR. SLOVER was unable to attend the RCS holiday concert upon his return.

42)     Shortly thereafter, MR. SLOVER received an email from MR. ANKRUM stating that he was "missed immensely" at the concert. He expressed disappointment that MR. SLOVER failed to "give notice" that he was not attending the concert. Meanwhlie, MR. SLOVER had informed MR. ANKRUM's secretary via email that he was not going.

43)     MR. ANKRUM fabricated a pretextual paper trail by then stating that MR. SLOVER's "relationship" with MS. BRANKER "doesn't allow you the flexibility to properly manager her." MR. ANKRUM then referred to MS. BRANKER as a "superstar" due to some purported "collaboration" with Mr. Eric Davidson that took place in MR. SLOVER's absence. Shortly thereafter, MR. SLOVER was demoted and Mr. Davidson was promoted to Dean of Students of Kindergarten through Third Grade. MR. ANKRUM's entire course of action here was a calculated plan to legitimize the promotion of Mr. Eric Davidson, an otherwise unqualified and poor candidate, to the position of Dean, and substantiate the otherwise inexplicable demotion of the well-qualified and effective MR. SLOVER.

44)     In approximately January 2013, during a Professional Development seminar, the "Positive Behavior Support" team, or "PBS" for short, presented a training lesson to the staff. The topics of the training lesson included emergency-action plans, per New York State mandate, relating to fire evacuation, campus evacuation, code red/active shooter on campus, tornado/hazardous weather procedures, and more. Throughout the training, Mr. Davidson was on his cell phone, texting, and not paying attention. Plaintiffs observed that Mr. Davidson was texting MR. ANKRUM during this time. MR. ANKRUM and Mr. Davidson spent most of the training exchanging sophomoric, dirty acronyms for the acronym "PBS". No discipline was

levied against Mr. Davidson or MR. ANKRUM for their use of a cell phone during these important meetings.

45)     In approximately February 2013, MR. SLOVER asked MR. ANKRUM what his role was in light of the recent demotion, promotion of Mr. Davidson, and other changes going on. MR. ANKRUM responded "I'm not sure. Michelle is going to write down what she thinks her responsibilities should be and then I'll let you know." MR. ANKRUM then told MR. SLOVER that he was "pissed off" at him for "not being proactive enough" in stopping the "negativity" among the staff members. Illegally, MR. ANKRUM wanted MR. SLOVER to retaliate against those that disagreed with MR. ANKRUM's illegal employment practices. MR. SLOVER refused to be one of MR. ANKRUM's pawns in his discriminatory agenda and was retaliated against as a result.

46)     That afternoon, MR. SLOVER, MR. ANKRUM, and Mr. Davidson observed two demo lessons. During the entire lesson, MR. ANKRUM and Mr. Davidson were on their cell phones sending text message and/or browsing the internet. No discipline was levied upon MR. ANKRUM or Mr. Davidson for their improper use of their cell phones.

47)     Subsequently, another candidate was interviewed by MR. SLOVER, MR. ANKRUM, and Mr. Davidson. MR. ANKRUM and Mr. Davidson spent the better part of the interview arguing over whether Batman was a "superhero or vigilante". During an earlier interview in which MR. ANKRUM was not present, Mr. Davidson asked zero questions of the candidate, which was clearly reflective of his lack of experience and knowledge. MR. SLOVER was embarrassed to be associated with two "administrators" acting so unprofessionally and representing RCS so poorly.

48)     In approximately April 2013, Ms. MARY ELLEN WEAVER wrote a letter to the Board of Trustees outlining MR. ANKRUM's various violations of law, RCS policy and protocols, the Collective Bargaining Agreement, and also complained of unlawful discrimination and harassment.

49)     In approximately May 2013, most teachers received letters from the school outlining their employment for the following year. Ms. MARY ELLEN WEAVER did not receive any such letter at the same time as all of her colleagues. After a few days, she followed up with RCS to inquire as to why she had not yet received her letter. Shortly thereafter, MR. ANKRUM wrote Ms. MARY ELLEN WEAVER an email stating, inter alia "Several letters were submitted to the board highlighting improprieties at RCS. These letters must be investigated thoroughly, before any decision regarding your employment is rendered."     MR. ANKRUM's reply, together with the harassment, hostile work environment, intimidation, and retaliation that Ms. MARY ELLEN WEAVER suffered throughout her employment at RCS, caused her such extreme stress and anxiety that she went to the doctor. She was advised by her physician not to return to work for 48 hours. Shortly thereafter, Ms. MARY ELLEN WEAVER determined the stress and the hostile work environment were too much for her to bear, and she was left with no choice but to leave employment at RCS.

50)     In approximately April 2013, MR. ANKRUM violated numerous protocols pertaining to state testing, including late commencement of the exams and his failure to show up for school to administer the exams.

51)     On numerous occasions, Mr. Davidson and MR. ANKRUM were noted to leave the school without informing anyone or giving notice as to when they would return. They were commonly observed to act in a childish and "frat boy" mentality.

52) As a fellow administrator, MR. SLOVER had numerous conversations with MR. ANKRUM in which MR. ANKRUM indicated that the "union was a pain" and that he "did not want to have to deal with the union" when it came to getting rid of the teachers that MR. ANKRUM wanted to get rid of. MR. SLOVER also had numerous conversations with MR. ANKRUM in which MR. ANKRUM indicated that, if he wanted to get rid of someone, "all he had to do was just create a negative evaluation for them and refuse to renew their contract."

53) Many Plaintiffs were members of New York State United Teachers (hereinafter "the Union"). Shortly after his hire, MR. ANKRUM commenced a plan to disband the Union in order to rid the school of Caucasian, older, female teachers. MR. ANKRUM understood the Union provided certain protections to its members. MR. ANKRUM understood that the teachers that were willing to speak up to protect their rights with the Union were the older, Caucasian, women. MR. ANKRUM understood that in order to rid the school of the older, Caucasian, female teachers, he needed to disband the Union. MR. ANKRUM actively campaigned privately and in a calculated manner to deter support for the Union and encourage people to join "his side". He openly and arrogantly expressed his opinion that the Collective Bargaining Agreement (hereinafter, "CBA") could not stop him and "could not save anyone's job".

54) Following a Union rally, MR. ANKRUM spoke with Plaintiffs, and outwardly dismissed the cause behind the rally because "there were not even that many minorities" rallying.

55) It was well known amongst employees of RIVERHEAD CHARTER SCHOOL that MR. ANKRUM was vindictive, vengeful, and retaliatory. He created a hostile work environment wherein employees were afraid for their jobs, and even their safety, if they disagreed with him. In acting in such a vengeful, vindictive, and retaliatory manner, MR. ANKRUM proudly discouraged objection to his discriminatory actions and his illegal agendas.

He acted with intent to put fear in anyone that voiced their objection to his opinion, or supported those that disagreed with him.

56)     MR. ANKRUM actively sought to create alliances with groups of individuals to create artificial support for his agenda to rid the school of Caucasian, older, female teachers. Similarly, he actively campaigned to break those "alliances," or, as Plaintiffs would call them, "friendships," between those whom MR. ANKRUM believed were against him. Teachers that refused to ally with MR. ANKRUM, objected to MR. ANKRUM's discriminatory acts, and/or supported those teachers whom MR. ANKRUM discriminated against, were retaliated against in the form of calculated and premeditated demotions, increased supervisions and evaluations, artificial negative paper trails, termination from employment, and more. He was nasty. He instilled fear – over both Plaintiffs' continued employment and for their physical safety. He was physically aggressive. He tended to be at his worst behind closed doors. Yet, he had a sociopathic ability to create the appearance of propriety when he believed he could be found out. MR. ANKRUM believed he could escape or circumvent liability or wrongdoing by "declining to renew" a teacher's contract as opposed to "firing" them.

57)     Despite years of positive evaluations, positive parent reviews, positive student reviews, and general respect of their peers prior to MR. ANKRUM's employment, Plaintiffs learned quickly into MR. ANKRUM's employment that they were the subject of his discriminatory agenda. MR. ANKRUM manufactured negative performance reviews and even fabricated stories to form pretexts to adverse tangible employment action taken against Plaintiffs. Plaintiffs' relationship with MR. ANKRUM was often negative and hostile. He appeared to be "out to get" the Plaintiffs.

58)  MR. ANKRUM routinely informed the teachers that Caucasians are, because of the color of their skin, innately unable to relate to African-American students. In addition to insulting, racist, and discriminatory, Plaintiffs found this to be surprising, as they had routinely taught children of all backgrounds and races without issue in the past.

59)  In approximately August of 2013, MR. ANKRUM held a seminar before all teachers, including Plaintiffs, in which he brought in a Caucasian teacher from another school to teach the "White Teachers" "how to teach black students". MR. ANKRUM introduced this woman as "white chocolate". MR. ANKRUM was friendly with this woman. She appeared to have MR. ANKRUM's respect. This teacher was Caucasian and revealed that she was dating an African-American man, and that was the reason that MR. ANKRUM referred to her as "white chocolate," which name Plaintiffs learned was a crude reference to skin tones.  MR. ANKRUM was sending a message that Caucasian women should have sex with African-American men in order to gain his, and African-American men's, respect. MR. ANKRUM was also sending a message that, in order to better understand the black students, the women should have sex with an African-American man. Plaintiffs were made to feel discriminated against, sexually harassed, and uncomfortable by this message.

60)  Plaintiffs had years of experience teaching students of all different backgrounds. Plaintiffs cared about their jobs, and cared deeply about each and every one of their students' successes, regardless of each student's race. Yet, MR. ANKRUM often made racist remarks such as "if you are not black you cannot understand these children" and "if you are not black you cannot connect with these children." In "Professional Development" seminars, MR. ANKRUM spoke in a demeaning manner of the "White silver spooners". MR. ANKRUM spoke often of his devotion and passion for "minority education and educational equality". In the course of his

agenda, MR. ANKRUM conflated and equivocated "underprivileged" students with "minority" students.

61)     In another seminar, MR. ANKRUM separated the teachers at RCS, including Plaintiffs, into three groups: "low-," "mid-," and "high-" socioeconomic statuses. In order to determine the group in which each Plaintiff belonged, MR. ANKRUM asked the teachers, in front of the entire group, the name of the town in which each teacher grew up. MR. ANKRUM then used his generalized perception of the socioeconomic status of that town and assigned each teacher to one of the groups. MR. ANKRUM referred to the "High" class as "White silver spooners". Plaintiffs were made to feel uncomfortable as they were forced to discuss the "advantages and disadvantages" of their childhoods. MR. ANKRUM then associated the "advantages and disadvantages" of each teacher's childhood with their race and socioeconomic status. MR. ANKRUM also unfairly generalized that those from the "Higher" socioeconomic upbringings were automatically "White," and those from the "lower" socioeconomic upbringing were automatically "black". MR. ANKRUM revealed his distaste and his prejudice for the "White silver spooners" as he explained his opinions that "White silver spooners" have/had more societal advantages than "blacks," and, as such, were the subject of his scorn. MR. ANKRUM also discussed the "White Privilege" and his discomfort with same.

62)     Plaintiffs believed they were being judged by their race, discriminated against, and were made to feel uncomfortable as a result. Unequivocally, each Plaintiff, regardless of their upbringing or socioeconomic background, approaches/approached each student with the same amount of love, compassion, tolerance, and equality in their quest to shape their minds and further their education at RCS.

63)     MR. ANKRUM, in a calculated manner, would hire younger teachers and indoctrinate them with his beliefs that the Union should not exist. He would go so far as to make the newly-hired, younger teachers promise that they would disband the Union. Again, MR. ANKRUM viewed the Union as an obstacle to his discriminatory agenda, because it gave the Plaintiffs additional protections. The younger teachers, happy to have a job and not looking to disturb or upset their boss and new employer, obliged. Older and more experienced teachers, namely Plaintiffs, were more understanding of their rights and tended to speak out in enforcement of same. They spoke out in objection to MR. ANKRUM's illegal employment practices. MR. ANKRUM was determined to rid RCS of these teachers.

64)     In approximately December 2013, during a "Professional Development" seminar, MR. ANKRUM separated the older staff from the younger staff and asked questions as to whether they were Union supporters. MR. ANKRUM commonly referred to the older staff as "veterans". He used the term "veteran" in a demeaning, insulting, and negative manner in order to convey his views that older teachers were "archaic," "old-fashioned," "antiquated," "from the same decade as his mother," and the like. MR. ANKRUM conveyed that "veterans" were the problem with RCS, and should not be employed by RCS. Once he separated the "veterans" from the younger teachers, it was easier for him to decipher specifically which of the older teachers were Union supporters.

65)     At this Professional Development seminar, most teachers indicated their support for the Union. MR. ANKRUM threatened during this seminar: "For any star teachers looking for jobs during the Christmas break, you should know that if I want to find a reason to fire you, I will fire you and the CBA will allow me to do so." Again, MR. ANKRUM used threats of termination to dissuade objection to his discriminatory agenda. Meanwhile, he was alienating the

older "veteran" teachers from the younger. Plaintiffs were made to feel uncomfortable by MR. ANKRUM's actions and felt discriminated against as a result. Also, by articulating his views so publicly, MR. ANKRUM furthered a culture and atmosphere of fear whereby Plaintiffs grew concerned as to which teachers were "safe" to befriend in MR. ANKRUM's eyes. Where Plaintiffs befriended the "wrong" people at RCS, MR. ANKRUM let them know. He told them to "change who you have lunch with," and even went so far as to attempt to dictate who each Plaintiff could socialize with after hours. MR. ANKRUM used these socializing rules to attempt to retaliate against Plaintiffs by alienating those that disagreed with him. Where Plaintiffs did not follow MR. ANKRUM's socializing rules, they were retaliated against as well.

66) MR. ANKRUM often made discriminatory remarks to the older teachers. During the implementation of a new computer program, most teachers at the school were having trouble acclimating to same. When it came to the Plaintiffs' difficulties with the new program, MR. ANKRUM made comments such as "you are technologically challenged", you are "inflexible", "you are antiquated," "you are old school," and "you are old-fashioned". Where younger teachers had problems with the new program, he did not criticize them and did not make them feel inferior. In the case of the Plaintiffs, MR. ANKRUM associated causally their age with their difficulties with the new program. MR. ANKRUM referred to older teachers' teaching degrees as "dinosaur certificates". MR. ANKRUM criticized older teachers and advised them to listen to the younger teachers because their "ideas were younger".

67) MR. ANKRUM was/is manipulative. MR. ANKRUM believed he could cover up his discriminatory agenda by creating paper trails in the form of poor performance evaluations and supposed complaints. MR. ANKRUM used the "teacher evaluation" as a bullying measure to intimidate teachers. His surprise evaluations were performed in neither the best interest of the

teacher, nor the student, nor the school. Rather, he used the performance evaluation as a means by which to create a superficial pretext for his discriminatory firings.

68)     MR. ANKRUM acted in a calculated manner to attempt to protect himself from complaints of discrimination.  Despite his agenda to "bust" the Union in order to rid the RCS of the older, female, Caucasian teachers, he ultimately believed the Union was "useless" because, "if he wanted to fire someone, in the worst case scenario, he could just wait until the end of the year to do so."

69)     MR. ANKRUM, believed to be of Christian faith, expressed distaste for non-Christians, and actions/beliefs that were not in accordance with the Christian faith. For example, Plaintiff JACLYN SCOGLIO divorced her husband during her employ at RCS. MR. ANKRUM indicated to her that he was disappointed that she was getting divorced, because "it was important for students to be taught by members of nuclear families and that being divorced negatively affected her teaching ability." Days after informing of her divorce, Plaintiff JACLYN SCOGLIO was placed on an "improvement plan," despite recently receiving a stellar performance review.

70)     Plaintiff FARAH MARTIN, was terminated because a news article surfaced regarding her custody battle and divorce with her same-sex partner. MR. ANKRUM emailed the news article around the school to many teachers. Soon thereafter, Plaintiff FARAH MARTIN was terminated in an act of discrimination for the fact that she was discovered to be a lesbian and because that did not comport with MR. ANKRUM's close-minded beliefs. Prior to MR. ANKRUM's discovery that Plaintiff FARAH MARTIN was lesbian, Plaintiff FARAH MARTIN received stellar performance reviews. It was only immediately following MR. ANKRUM's

discovery that Plaintiff FARAH MARTIN was lesbian that any negative performance evaluation surfaced. She was terminated shortly thereafter.

71)     Jewish Plaintiffs, FARAH MARTIN, ANDREA VAN EPPS, and SHERRIE ORESTIS suffered consistent snide remarks about their Jewish faith from MR. ANKRUM. Their requests for him to cease such discriminatory comments were either ignored or withheld due to fear that he would grow worse and retaliate.

72)     MR. ANKRUM hired his, upon information and belief, friend and college roommate, Mr. Davidson. Upon information and belief, Mr. Davidson had virtually no experience and no teaching certification at the time. Upon information and belief, Mr. Davidson "identifies as Black," yet MR. ANKRUM refers to him as "White Boy E E".

73)     MR. ANKRUM appointed Mr. Davidson, his male friend, to be a co-teacher in a classroom with Plaintiff JACLYN SCOGLIO. Mr. Davidson frequently spent class time on his cell phone, on his computer doing work for his private business, while Plaintiff JACLYN SCOGLIO did all the teaching, planning, and grading. Yet, Mr. Davidson informed her that he and MR. ANKRUM had daily conversations about who MR. ANKRUM was going to fire, creating a constant state of fear and intimidation. Plaintiffs received harsh scrutiny for the slightest missteps. MR. ANKRUM turned the smallest issues into supposed bases for termination. Yet, MR. ANKRUM's ally, his male friend who "identifies as black," was not subjected to the same criticism and was essentially allowed to do as he pleased, regardless of whether the rules required otherwise.

74)     MR. ANKRUM sexually harassed the staff. He favored younger women employees, whom he believed to be attractive. Plaintiffs were not the subject of his sexual attraction, and were made to feel of lesser importance and worth at the school because of it.

When female Plaintiffs wore skirts that were below the knee, MR. ANKRUM criticized them for "dressing like a nun." Female employees that dressed provocatively were treated as friends, subjected to less-stringent applications of the rules, and generally allowed to break rules. Meanwhile, Plaintiffs were terminated for less. Female Plaintiffs were made to feel objectified and sexually harassed by MR. ANKRUM's actions.

75)  MR. ANKRUM also showed preferences for younger women whom MR. ANKRUM found to be attractive. It was widely known that MR. ANKRUM maintained a "hot list" of teachers MR. ANKRUM believed to be attractive and with whom MR. ANKRUM would like to have sex. It was also understood that MR. ANKRUM and Mr. Davidson watched pornography together in the Dean's Office, even where a young student was nearby.

76)  MR. ANKRUM openly joked about overweight teachers' weight in front of other teachers. The teachers that heard these jokes were insulted, and hurt for the other teachers. Again, there was often too much fear to object, as those who objected in the past were dealt harsh retaliation. MR. ANKRUM thereby perpetuated a culture of "fat-shaming" and furthered the culture that the "hot list" teachers to whom MR. ANKRUM was attracted were of a higher value than others.

77)  Teachers that were younger than Plaintiffs, and who dressed more provocatively than Plaintiffs, were not subjected to the same harsh criticism as Plaintiffs. Upon information and belief, one teacher, Ms. Lisa Marchese, was openly involved in a sexual relationship with MR. ANKRUM's right-hand man, Mr. Davidson. In exchange, that young teacher was treated differently than the other teachers. Ms. Marchese, as a reward for her sexual relationship with MR. ANKRUM's friend, was allowed to sit casually on tables during staff meetings, while Plaintiffs and other teachers were required to sit professionally in chairs. This young teacher was

allowed to walk in and out of professional development meetings at her leisure, where Plaintiffs and other teachers were subjected to scorn for the same actions. This young teacher was allowed to use her cell phone during professional development meetings, where Plaintiffs and other teachers were admonished for same. This young teacher often would change into revealing and provocative workout gear at the close of the school day and then leave with MR. ANKRUM and Mr. Davidson to go work out at Mr. Davidson's gym. This young teacher was allowed to use her cell phone during class, whereas Plaintiff JACLYN SCOGLIO was ultimately terminated for a fabricated complaint of cell phone use during class. This young teacher was provided special exceptions, while Plaintiffs were not. This created the belief in the teachers that, in order to be on MR. ANKRUM's good side, you had to either sleep with him or his right-hand man, Mr. Davidson.

78) Shortly after the December 2013 Professional Development seminar, Plaintiff JACLYN SCOGLIO, one of the "veterans" that spoke out in objection to MR. ANKRUM's and RCS's illegal employment practices, was terminated for a pretextual reason, namely "utilization of a cell phone during class." Defendants relied on an awfully suspect basis for her termination, especially considering the fact that Plaintiff JACLYN SCOGLIO had received numerous accolades for her teaching successes at RCS.

79) Plaintiff JACLYN SCOGLIO became one of the first in a line of firings of the older, Caucasian, female teachers. Plaintiffs existed in a constant state of fear over their jobs. MR. ANKRUM threatened the Plaintiffs that their support of JACLYN SCOGLIO would not be allowed. MR. ANKRUM, in the course of his discriminatory agenda, was determined to snuff any defectors and objections to his ways.

80)    As another retaliatory vehicle, MR. ANKRUM used "prep times" against complaining Plaintiffs. Teachers used "prep times" to prepare for their classes through out the day. Where teachers complained, MR. ANKRUM disciplined them by taking away "prep times."

81)    In fact, through the date of the filing of this lawsuit, many potential Plaintiffs are afraid to reveal their objections to MR. ANKRUM's illegal employment practices because they fear retaliation, ranging from adverse employment action to actual bodily harm, from MR. ANKRUM.

82)    Upon information and belief, in a further calculated plan to gain the favor of the Board of Trustees of the School, it is believed that MR. ANKRUM has a special and/or sexual relationship with the President of the RCS Board of Trustees, Ms. Zenobia Hartfield. This relationship is widely known amongst the faculty. Ms. Hartfield's relationship with MR. ANKRUM further created the hostile work environment, as Plaintiffs knew that objections and complaints regarding MR. ANKRUM would be futile because Ms. Hartfield would be in favor of her friend, MR. ANKRUM.

83)    Another member of the RCS Board of Trustees, Ms. Joy Rankin, has been accused of similar racial discrimination in her position as Director of the Riverhead Free Library. Upon information and belief, she has a matter pending before the New York State Division of Human Rights for similar racial discrimination as is alleged in the instant complaint.

84)    MR. ANKRUM was also known to discriminate against the children as well for their race and their disabilities.   Where African-American students were diagnosed with disabilities, MR. ANKRUM embraced them and treated their needs with compassion. Where non-African-American children had special needs MR. ANKRUM made fun of them, criticized them, ignored their needs, and more. As it pertains to one six-year-old student, a child that cried

in school often and needed a lot of extra attention, MR. ANKRUM was known to call him an "asshole." SHERRIE ORESTIS witnessed MR. ANKRUM call the boy an "asshole" to the child's face. SHERRIE ORESTIS, in sheer and utter shock, asked MR. ANKRUM "how could you say such a thing?" MR. ANKRUM replied "What can [the student] even do about it?" This was yet another example of MR. ANKRUM's distaste for and discrimination of disabled individuals and disparate treatment of Caucasian and African-American individuals and contributed to the hostile work environment Plaintiffs suffered. MR. ANKRUM's conduct in this regard corroborated and confirmed the discrimination, harassment, and disparate treatment suffered by the Plaintiffs as employees.

85)    On another occasion, Plaintiffs witnessed MR. ANKRUM forcing a parent to place her child on medication. Despite the fact that some Plaintiffs had professional degrees and disagreed with the decision, MR. ANKRUM told the parent that if the parent did not have her child placed on medication, that the child would be kicked out of the school.

86)    MR. ANKRUM did not express much concern for following state laws pertaining to Special Education Services, inclusion/collaborative classrooms, and students' IEPs. Very often, classrooms that required two teachers by law were left to be taught by one teacher. Despite being confronted with these issues, MR. ANKRUM ignored the issues and forced the classrooms to be taught illegally by only one teacher. When it came time to mark the attendance records, MR. ANKRUM forced the Plaintiffs to mark the attendance cards as though services were being properly rendered. Plaintiffs confronted either MR. ANKRUM, or then-Dean Mr. Davidson with these issues, requesting substitutes and and/or the required level supervision/instruction. MR. ANKRUM and RCS were well aware of the non-compliance issues.

87)     In approximately Spring 2014, MR. ANKRUM terminated the 5th-8[th] grade ESL teacher. Subsequently, Defendants allowed the ESL students to spend the last two months of school without an ESL teacher. Such was further evidence of RCS's and MR. ANKRUM's lack of concern for the laws of this state and exacerbated the hostile work environment felt by the Plaintiffs. Plaintiffs continued to exist in fear as they learned there was nothing they could do to stop the illegal ways of the Defendants.

88)     RCS granted MR. ANKRUM virtually unchecked authority to turn RCS into his personal sociological race experiment whereby he vilified and attempted to create racists out of good-hearted, loving, tolerant accepting Plaintiffs herein. Their only "crime" was being of the wrong race, wrong gender, wrong sexual orientation, and wrong religion, in MR. ANKRUM's eyes, and for standing up for their rights under the laws of the State of New York and under the laws of the United States of America. Even after numerous complaints, New York State Division of Human Rights complaints, Union complaints, Union rallies, RCS failed to take this matter seriously. RCS's failure to act to date has been none other than a ratification and condonation of the illegal agenda perpetrated by MR. ANKRUM.  In fact, as of the date of the original filing of the Summons and Complaint, October 4, 2015, MR. ANKRUM continues to rule the school with impunity.

89)     The allegations of fact contained in this Complaint are common knowledge to all Plaintiffs, and each allegation directly contributes to each individual Plaintiff's claim of a hostile work environment and illegal employment practices.

### FURTHER SPECIFIED ALLEGATIONS
### AS TO MARY ELLEN WEAVER

90)     Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in paragraphs 1-88 as though set forth at length herein.

91)    MS. WEAVER is a now-45-year-old Caucasian woman. She was a teacher at RCS from approximately October 2009 through June 2013. Prior to MR. ANKRUM's hire, MS. WEAVER received positive reviews from parents, other teachers, and students.

92)    Issues with MS. WEAVER'S employment only began once she began working with MR. ANKRUM. MS. WEAVER learned very early on of MR. ANKRUM's discriminatory and retaliatory ways. She worked in a constant state of fear and oppression. When it came time for the RCS retreat, MS. WEAVER was too afraid to speak up.

93)    Following the retreat, MR. ANKRUM counseled MS. WEAVER to "stay away from" MS. BRANKER. MR. ANKRUM knew that MS. BRANKER and MS. WEAVER were friends, and so therefore set up the "second office" outside of MS. BRANKER's classroom to intimidate them and try to prevent them from speaking. MS. WEAVER was scared for her job and did what she could to pacify MR. ANKRUM.

94)    In approximately January 2013, a parent was dissatisfied with the special education services and RCS's failure to adhere to the student's IEP. MR. ANKRUM ordered MS. WEAVER to "bully the mother into pulling her child out of the school." MS. WEAVER did not want to do this but felt no other option, as MR. ANKRUM warned of retaliation for her failure to comply.

95)    On another occasion, another parent was upset that her child was not receiving proper services according to the IEP. MS. WEAVER spoke with the parent and advised her of the necessary steps she would need to take with RCS to ensure that her child's IEP was being followed. MR. ANKRUM sent a text message to MS. WEAVER saying "if I find out you are 'working against me' I will be heartbroken." MS. WEAVER understood, based on her experience with MR. ANKRUM that this message was a threat despite the seemingly soft nature

of the words used. MR. ANKRUM essentially ignored MS. WEAVER from this point on, and denied MS. WEAVER certain benefits as a result.

96)     In approximately April 2013, MS. WEAVER wrote a letter to the authorizers of RCS's charter outlining various violations of the charter and state and federal law, as well as complaining of discrimination and harassment. MS. WEAVER also submitted the letter to the Board of Trustees.

97)     In approximately May 2013, MS. WEAVER was instructed to meet with an "outside investigator" named Sima Ali, Esq. MS. WEAVER was informed that a sexual harassment complaint had been filed against her by Mr. Eric Davidson. MS. WEAVER was utterly shocked and had no idea what the complaint could possibly be about. Mr. Davidson's complaint was filed as MR. ANKRUM's retaliatory act to dilute MS. WEAVER's justified complaints. MS. WEAVER asked multiple times to see the "findings of fact" regarding this "independent investigation" but was denied same.

98)     MS. WEAVER began suffering from anxiety and high blood pressure as a result of the stress caused by RCS and MR. ANKRUM's retaliation against her.

99)     In late May 2013, RCS employees began receiving their "determination of employment" emails from RCS. After a few days, MS. WEAVER wrote to request her status, since she never received an email. MR. ANKRUM replied stating, *inter alia*, that "several letters were submitted to the board highlighting improprieties at RCS. These letters must be investigated thoroughly, before any decision regarding your employment is rendered." MS. WEAVER was caused further anxiety and undue stress from MR. ANKRUM's response. She was advised by her physician to refrain from work for 48 hours.

100)    Another few days passed without a response and MS. WEAVER was left with no choice but to resign.

101)    Plaintiff MS. WEAVER was one of the Caucasian, older, female teachers MR. ANKRUM was determined to remove from the school. She was subjected to unlawful discrimination based upon her race, gender, and age. Plaintiff MS. WEAVER was sexually harassed in the hostile work environment MR. ANKRUM created, as she did not receive the same kind of preferential treatment given to the younger teachers with whom MR. ANKRUM wanted to engage in sexual relations.

102)    Plaintiff MS. WEAVER was one of the Caucasian, older, female teachers MR. ANKRUM was determined to remove from the school. She was subjected to unlawful discrimination based upon her race, gender, and age. Plaintiff MS. WEAVER was sexually harassed in the hostile work environment MR. ANKRUM created, as she did not receive the same kind of preferential treatment given to the younger teachers with whom MR. ANKRUM wanted to engage in sexual relations.

## FURTHER SPECIFIED ALLEGATIONS
## AS TO DAVID SLOVER

103)    Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in paragraphs 1-101 as though set forth at length herein.

104)    MR. SLOVER is a now-46-year-old Caucasian male. He was an administrator at RCS and developed a great rapport with the students, parents, and teachers.

105)    MR. SLOVER was one that commonly stood up for and joined the complaints lodged against MR. ANKRUM. MR. SLOVER was receptive to the complaints of discrimination, harassment, and other violations of state and federal law.

106)     As a retaliatory measure against MR. SLOVER, MR. ANKRUM fabricated issues with MR. SLOVER's employment. Such issues included a "blurry relationship with the teachers," that MR. ANKRUM had "egg on his face," and that the parents and students were "uninformed." MR. SLOVER requested specific examples of these "issues" MR. ANKRUM gave no examples of any issues and was unable to further explain what he meant.

107)     Shortly thereafter, MR. SLOVER was demoted and Mr. Eric Davidson was promoted to MR. SLOVER's position.

108)     When Mr. Davidson made mistakes in his new position, which was frequent due to extreme lack of experience, MR. ANKRUM would overlook it and say things such as "well, I know he has my back." When MR. SLOVER would ask for an actual description of the manner in which he was "disappointing" MR. ANKRUM, MR. ANKRUM would simply state that he "could not put his finger on it".

109)     Plaintiff MR. SLOVER was one of the Caucasian RCS employees that MR. ANKRUM was determined to remove from the school. MR. ANKRUM subsequently retaliated against MR. SLOVER by terminating him for his support of those objecting to illegal employment practices. MR. SLOVER was replace by someone that "identified as black" and was not inclined to object to his unlawful employment practices.

## FURTHER SPECIFIED ALLEGATIONS
## AS TO LACEY BRANKER

110)     Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in paragraphs 1-108 as though set forth more fully herein.

111)     MS. BRANKER is a now-36-year-old Caucasian woman. She was employed at RCS from approximately December 2007 through approximately April 15, 2013. MS. BRANKER was known as one of the RCS employees that objected to MR. ANKRUM's illegal

employment practices. Ultimately, following one of her complaints, MS. BRANKER was told by MR. ANKRUM, that she "could either sit down and shut up and listen or" she "could be terminated."

112)   MS. BRANKER was one of the teachers MR. ANKRUM subjected to unlawful discrimination based upon her race, gender, and age. Plaintiff MS. BRANKER was sexually harassed in the hostile work environment MR. ANKRUM created, as she did not receive the same kind of preferential treatment given to the younger teachers with whom MR. ANKRUM wanted to engage in sexual relations.

## FURTHER SPECIFIED ALLEGATIONS
## AS TO RAYMOND PATUANO

113)   Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in paragraphs 1-112 as though set forth more fully herein.

114)   MR. PATUANO is a now-32-year-old Caucasian male. He was employed at RCS for approximately three years before he was terminated in retaliation objecting to illegal employment practices and for supporting those that had complained of same.

115)   During his employment at RCS, MR. PATUANO had made complaints against MR. ANKRUM of illegal employment practices.

116)   On approximately February 14, 2014, MR. PATUANO appeared at an unofficial union meeting. At this meeting, he was asked whether he wanted to disband the union. MR. PATUANO voted no, and his vote was announced to everyone in the room.

117)   Immediately Following MR. PATUANO's support of the union and thus those that objected to RCS/MR. ANKRUM's illegal employment practices, MR. ANKRUM and Mr. Davidson were out to get him. Shortly thereafter, in February 2014, MR. PATUANO was terminated.

118)    Plaintiff MR. PATUANO was one of the Caucasian RCS employees that MR. ANKRUM was determined to remove from the school. MR. ANKRUM subsequently retaliated against MR. PATUANO by terminating him for his support of those objecting to illegal employment practices.

## FURTHER SPECIFIED ALLEGATIONS
## AS TO DONNA SHEPROW

119)    Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in paragraphs 1-118 as though set forth more fully herein.

120)    MS. SHEPROW is a now-38-year-old Caucasian female. She was employed at RCS for approximately three years before she was constructively discharged due to retaliation for objecting to illegal employment practices and for supporting those that had complained of same.

121)    During her employment at RCS, MS. SHEPROW had made complaints, and otherwise objected to, MR. ANKRUM and RCS's illegal employment practices.

122)    Plaintiff MS. SHEPROW was one of the Caucasian RCS employees that MR. ANKRUM was determined to remove from the school. MR. ANKRUM subsequently retaliated against MS. SHEPROW by making her life at work so intolerable that she was left with no choice but to resign objecting to illegal employment practices.

## FIRST CAUSE OF ACTION
## AS TO MARY ELLEN WEAVER, DAVID SLOVER, LACEY BRANKER,
## RAYMOND PATUANO, and DONNA SHEPROW
### (Discrimination based upon Race, Gender, and Age in Violation of NYSHRL)

123)    Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in Paragraphs 1-122 as though fully set forth at length herein.

124)    Defendants have discriminated against Plaintiffs on the basis of their Race, Gender, and Age in violation of the NYSHRL by denying them the same terms and conditions of employment available to employees who are not Caucasian, female, and/or older, including but not limited to, subjecting them to disparate working conditions and denying them the opportunity to work in an employment setting free of unlawful harassment.

125)    Defendants have discriminated against Plaintiffs on the basis of their Race, Gender, and Age in violation of the NYSHRL by creating, fostering, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive harassment of Plaintiffs because of their Race, Gender, and Age.

126)    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiffs have suffered and continue to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which they are entitled to an award of monetary damages and other relief.

**SECOND CAUSE OF ACTION**
**AS TO MARY ELLEN WEAVER, DAVID SLOVER, LACEY BRANKER,**
**RAYMOND PATUANO, and DONNA SHEPROW**
**(Discrimination based upon Disability in Violation of NYSHRL)**

127)    Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in Paragraphs 1-126 as though fully set forth at length herein.

128)    Defendants have discriminated against Plaintiffs on the basis of their disability in violation of the NYSHRL by denying them the same terms and conditions of employment available to employees who are not suffering from a disability, including but not limited to, subjecting them to disparate working conditions and denying them the opportunity to work in an

employment setting free of unlawful discrimination and denying them a reasonable accommodation for their disability.

129) Defendants have discriminated against Plaintiffs on the basis of their disability in violation of the NYSHRL by creating, fostering, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive harassment of Plaintiffs because of their disability.

130) As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiffs have suffered and continue to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which they are entitled to an award of monetary damages and other relief.

### THIRD CAUSE OF ACTION
### AS TO MARY ELLEN WEAVER, DAVID SLOVER, LACEY BRANKER, RAYMOND PATUANO, and DONNA SHEPROW
### (Sexual Harassment in Violation of NYSHRL)

131) Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in Paragraphs 1-130 as though fully set forth at length herein.

132) Defendants discriminated against the Plaintiffs by subjecting Plaintiffs to a hostile work environment, in the form of unwelcome sexual harassment and third-party sexual harassment, which was severe and pervasive, in violation of NYSHRL.

133) Defendants discriminated against the Plaintiffs by subjecting Plaintiffs to unwelcome quid pro quo sexual harassment, which was severe and pervasive, in violation of NYSHRL.

134)     As a direct and proximate result of this unlawful discriminatory conduct in violation of NYSHRL, Plaintiffs have suffered and continues to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which they are entitled to an award of monetary damages and other relief.

**FOURTH CAUSE OF ACTION**
**AS TO MARY ELLEN WEAVER, DAVID SLOVER, LACEY BRANKER,**
**RAYMOND PATUANO, and DONNA SHEPROW**
**(Retaliation for Complaints of Discrimination/Harassment and/or Support for those**
**who have complained of Discrimination/Harassment in Violation of NYSHRL)**

135)     Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in Paragraphs 1-134 as though fully set forth at length herein.

136)     Defendants have retaliated against Plaintiffs, in violation of NYSHRL, for opposing and/or complaining of Defendants' sexual harassment and unlawful discriminatory practices against themselves and other employees at Defendant RCS by, inter alia, subjecting Plaintiffs to acts of discrimination, harassment and humiliation, mockery, encouraging and/or coercing Plaintiff's co-workers and supervisors to falsely contradict Plaintiff's truthful allegations of discrimination, harassment and/or retaliation, and/or terminating the Plaintiffs from employment.

137)     As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of NYSHRL, Plaintiffs have suffered and continue to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-

esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which they are entitled to an award of monetary damages and other relief.

### FIFTH CAUSE OF ACTION
### AS TO MARY ELLEN WEAVER, DAVID SLOVER, LACEY BRANKER, RAYMOND PATUANO, and DONNA SHEPROW
### (Negligent Hiring, Retention and Supervision)

138)  Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in Paragraphs 1-137 as though fully set forth at length herein.

139)  Defendants have violated their duty as Plaintiffs' employer to provide a safe workplace, to take reasonable steps to determine the fitness of Plaintiffs' supervisors and to reasonably supervise Plaintiffs' supervisors by, inter alia, failing and refusing to investigate and/or take appropriate disciplinary or other action in response to Plaintiffs' repeated verbal and written complaints of discriminatory and harassing conduct by their co-workers and/or supervisors on the bases stated herein. Defendants had actual knowledge of the undue risk of harm to which they were thereby exposing Plaintiffs based on Plaintiffs' repeated written and verbal complaints to their supervisors, Human Resources officials, and state and federal agencies.

140)  As a direct and proximate result of Defendants' breach of duty to supervise, Plaintiffs have been injured and have incurred damages thereby.

### SIXTH CAUSE OF ACTION
### AS TO MARY ELLEN WEAVER, DAVID SLOVER, LACEY BRANKER, RAYMOND PATUANO, and DONNA SHEPROW
### (Respondeat Superior)

141)  Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in Paragraphs 1-140 as though fully set forth at length herein.

142) At all relevant times herein, Defendant MR. ANKRUM was performing duties for Defendant RIVERHEAD CHARTER SCHOOL when the sexual harassment, discrimination, and retaliation occurred.

143) As a result, Defendant RIVERHEAD CHARTER SCHOOL is vicariously liable for all and any actions by Defendant RAYMOND ANKRUM during Plaintiffs' employment.

### SEVENTH CAUSE OF ACTION
### AS TO MARY ELLEN WEAVER, DAVID SLOVER, LACEY BRANKER, RAYMOND PATUANO, and DONNA SHEPROW
**(Aiding and Abetting Discrimination in Violation of the NYSHRL)**

144) Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in Paragraphs 1-143 as though fully set forth at length herein.

145) The NYSHRL prohibits any person from aiding, abetting, inciting, or compelling any of the acts which it forbids, or attempting to do so.

146) As described above, Defendants aided and abetted the unlawful discriminatory practices perpetrated against the Plaintiffs.

147) As a direct and proximate result of Defendants' aiding and abetting unlawful discrimination in violation of the NYSHRL, Plaintiffs have suffered and continue to suffer monetary and/or economic damages, including, but not limited to, loss of future income, compensation and benefits, mental anguish and emotional distress, loss of self-esteem and self-confidence, and emotional pain and suffering for which they are entitled to an award of monetary damages and other relief.

### EIGHTH CAUSE OF ACTION
### AS TO MARY ELLEN WEAVER, DAVID SLOVER, LACEY BRANKER, RAYMOND PATUANO, and DONNA SHEPROW
**(Violation of 42 U.S.C. § 1983)**

148)     Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in Paragraphs 1-147 as though fully set forth at length herein.

149)     At all material times, Defendants were acting under color of state law, within the scope of their employment and/or their agency relationship with the municipality, and in concert with one another. These Defendants intentionally, outrageously, and recklessly disregarded Plaintiff's rights under the Federal Constitution.

150)     Defendants acted with an evil motive and intent, reckless disregard, and callous indifference to Plaintiff's federally protected rights.

151)     Defendants are liable under 42 U.S.C. § 1983 for all of the aforementioned reckless, outrageous, willful, wanton, malicious, and/or intentional acts and omissions, practices and policies of Defendants, while committed under color of state law, which resulted in the deprivation of Plaintiffs' federal constitutional rights, including, but not limited to,:

a.     Their right to equal protection, enjoyment of civil and/or political rights, and right to be free from discrimination because of her sex, race, age, disability, sexual orientation, religion, and any other protected class, in violation of the Fourteenth Amendment to the United States Constitution,

b.     their right to due process and fair and just treatment in violation of the procedural component of the Fourteenth Amendment to the United States Constitution,

c.     their right to beneficial and full use and enjoyment of their property in violation of the Fifth and Fourteenth Amendments to the United States Constitution,

d.     their right to be free from arbitrary and unreasonable government action that deprives them of their rights in violation of the substantive due process clause of the Fourteenth Amendment to the United States Constitution and other laws.

152)     Defendant, RCS, acting under color of state law, was deliberately indifferent to the conduct of the individual Defendant, MR. ANKRUM, herein alleged and was a proximate cause of such unconstitutional conduct.

153)     Defendants, RCS, under color of state law, and by their own custom, policy, and/or practice of failing to properly screen and/or hire, train, evaluate, supervise, investigate, review and/or discipline its employees and/or agents, including the named Defendant, MR. ANKRUM, and members of its Board of Trustees, was a proximate cause of the unconstitutional conduct herein alleged.

154)     As a direct and proximate result of these policies, practices, and customs, Plaintiffs were deprived of their rights protected by the federal constitutional as described above, including, but not limited to:

   a.  Their right to equal protection, enjoyment of civil and/or political rights, and right to be free from discrimination because of her sex, race, age, disability, sexual orientation, religion, and any other protected class, in violation of the Fourteenth Amendment to the United States Constitution,

   b.  their right to due process and fair and just treatment in violation of the procedural component of the Fourteenth Amendment to the United States Constitution,

   c.  their right to beneficial and full use and enjoyment of their property in violation of the Fifth and Fourteenth Amendments to the United States Constitution,

   d.  their right to be free from arbitrary and unreasonable government action that deprives them of their rights in violation of the substantive due process clause of the Fourteenth Amendment to the United States Constitution and other laws.

155) As a direct and proximate result of Defendants' conduct and constitutional violations, Plaintiffs have suffered injury and damages, past, present, and future, as set forth in the above and in the common allegations of this Complaint.

## NINTH CAUSE OF ACTION
### AS TO MARY ELLEN WEAVER, DAVID SLOVER, LACEY BRANKER, RAYMOND PATUANO, and DONNA SHEPROW
### (Discrimination based upon Race in Violation of 42 U.S.C. §1981)

156) Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in Paragraphs 1-155 as though fully set forth at length herein.

157) Defendants have discriminated against Plaintiffs on the basis of their Race, in violation of the 42 U.S.C. §1981 by denying them the same terms and conditions of employment available to employees who are not Caucasian, including but not limited to, subjecting them to disparate working conditions and denying them the opportunity to work in an employment setting free of unlawful harassment and discrimination.

158) Defendants have discriminated against Plaintiffs on the basis of their Race in violation of the 42 U.S.C. §1981 by creating, fostering, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive harassment of Plaintiffs because of their Race.

159) As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the 42 U.S.C. §1981, Plaintiffs have suffered and continue to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which they are entitled to an award of monetary damages and other relief.

## TENTH CAUSE OF ACTION
## AS TO MARY ELLEN WEAVER, DAVID SLOVER, LACEY BRANKER, RAYMOND PATUANO, and DONNA SHEPROW
### (Retaliation for Complaints of Discrimination/Harassment and/or Support for those who have complained of Discrimination/Harassment in Violation of 42 U.S.C. § 1981)

160)    Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in Paragraphs 1-159 as though fully set forth at length herein.

161)    Defendants have retaliated against Plaintiffs, in violation of 42 U.S.C. § 1981, for opposing and/or complaining of Defendants' unlawful discriminatory practices against themselves and other employees at Defendant RCS by, inter alia, subjecting Plaintiffs to acts of discrimination, harassment and humiliation, mockery, encouraging and/or coercing Plaintiff's co-workers and supervisors to falsely contradict Plaintiff's truthful allegations of discrimination, harassment and/or retaliation, and/or terminating the Plaintiffs from employment.

162)    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of 42 U.S.C. § 1981, Plaintiffs have suffered and continue to suffer economic and noneconomic damages, including, but not limited to, lost wages, severe mental anguish and emotional distress, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which they are entitled to an award of monetary damages and other relief.

163)    Defendants' unlawful and retaliatory conduct in violation of 42 U.S.C. § 1981 was outrageous and malicious, was intended to injure Plaintiffs, and was done with conscious disregard of Plaintiffs' civil rights, entitling Plaintiffs to an award of punitive damages.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor and against Defendants RIVERHEAD CHARTER SCHOOL and RAYMOND ANKRUM, containing the following relief:

1)      The Determination and adjudication of these matters together, or, in the alternative, the severance of each Plaintiff's separate action to allow each Plaintiff to separately seek the below relief;

2)      A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the State of New York.

3)      A declaratory judgment that Defendant RIVERHEAD CHARTER SCHOOL is strictly and/or vicariously liable to the Plaintiffs for the discrimination complained of herein;

4)      Preliminary and permanent injunctions against Defendants, including Defendants' officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in the unlawful practices, policies, customs, and usages set forth herein, including, but not limited, the removal of Defendant RAYMOND ANKRUM from employment at Defendant RIVERHEAD CHARTER SCHOOL;

5)      An Order directing Defendant to place Plaintiffs in the positions they would have occupied but for Defendants' discriminatory treatment and otherwise unlawful conduct, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect their employment and personal life;

6) An award of damages not less than $2,000,000.00 (two million dollars) in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for all monetary and/or economic harm;

7) An award of damages not less than $2,000,000.00 (two million dollars) in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for all harm to their professional and personal reputations and loss of career fulfillment;

8) An award of damages not less than $2,000,000.00 (two million dollars) in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for all non-monetary and/or compensatory harm, including but not limited to, compensation for their mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, emotional distress and physical injuries;

9) An award of damages not less than $2,000,000.00 (two million dollars) for any and all other monetary and/or non-monetary losses suffered by Plaintiffs in an amount to be determined at trial, plus prejudgment interest;

10) An award of punitive damages not less than $2,000,000.00 (two million dollars), plus prejudgment interest, so as to punish the Defendants and deter them from committing future human rights violations of the sort detailed herein;

11) An award of costs that Plaintiffs have incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law;

12) An award of pre-judgment and post-judgment interest, as provided by law; and

13) Such other and further relief as the Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury on all issues of fact and damages stated herein.

## JURISDICTION – Federal Question

The Court has Federal Question Jurisdiction pursuant Defendants' violation of Federal Law and their deprivation of Plaintiff's civil rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, the Americans with Disabilities Act, and the Age Discrimination in Employment Act. As such, this Honorable Court has Federal Question jurisdiction pursuant to the provisions of 42 U.S.C. § 1331.

## JURISDICTION – Supplemental

Although claims arising under New York State law are interposed herein, this Honorable Court has jurisdiction over these claims pursuant to 42 U.S.C. § 1367. The claims asserted pursuant to state law arise out of the same nucleus of operative facts as those asserted pursuant to federal law, and it is respectfully submitted that it is logical that all claims are argued under the same case.

## VENUE

Pursuant to 42 U.S.C. § 1391, venue is proper in this district.

Dated: Garden City, New York

12-31-15

Yours, etc.

JOSEPH G. DELL
DELL & DEAN, PLLC
Attorneys for Plaintiffs
1225 Franklin Avenue, Suite 450
Garden City, New York 11530
(516) 880-9700

TO:   RIVERHEAD CHARTER SCHOOL
3685 Middle Country Rd
Calverton, NY 11933

RAYMOND ANKRUM
3685 Middle Country Rd
Calverton, NY 11933

UNITED STATES DISTRICT COURT      Case No.: 15-cv-06992
EASTERN DISTRICT OF NEW YORK     (SJF)(GRB)

---

MARY ELLEN WEAVER, DAVID SLOVER,
LACEY BRANKER, RAYMOND PATUANO,
And DONNA SHEPROW

                  Plaintiffs,

     -against-

RIVERHEAD CHARTER SCHOOL and RAYMOND
ANKRUM
               Defendants.

---

## SECOND AMENDED VERIFIED COMPLAINT

---

# DELL & DEAN, PLLC

**Attorneys for Plaintiffs**
**1225 Franklin Avenue**
**Suite 450**
**Garden City, New York 11530**
**(516) 880-9700**
**Facsimile (516) 880-9707**

---

TO:   RIVERHEAD CHARTER SCHOOL
       3685 Middle Country Rd
       Calverton, NY 11933

       RAYMOND ANKRUM
       3685 Middle Country Rd
       Calverton, NY 11933

# DELL & DEAN, PLLC

## ATTORNEYS AT LAW

1225 FRANKLIN AVENUE, SUITE 450
GARDEN CITY, NEW YORK 11530
OFFICE 516.880.9700
FAX 516.880.9707

www.D2TrialLaw.com

December 31, 2015

**Via ECF**
Magistrate Judge Gary R. Brown
Hon. Sandra J. Feuerstein, U.S.D.J.
United States District Court
Eastern District of New York
100 Federal Plaza
P.O. Box 830
Central Islip, New York 11722

RE:  **Case 2:15-cv-06992-SJF-GRB**
     **Weaver et al v. Riverhead Charter**
     **School, et al.**

Dear Judge Brown:

This office represents the Plaintiffs in the above noted matter. On or about October 8, 2015, Plaintiff filed a Summons and Complaint in the Supreme Court, Suffolk County. On or about November 23, 2015, Plaintiff filed in the Supreme Court Suffolk County, and served upon Defense Counsel, an Amended Complaint containing, among other things, a cause of action pursuant to 42 U.S.C. § 1981. Thereafter, Defendants removed this matter to Federal Court on December or about December 9, 2015. A copy of Plaintiffs' Amended Complaint was contained in Defendants Notice for Removal papers.

On or about December 21, 2015, Defendants filed a letter requesting an extension of their time to answer or otherwise respond. Additionally, Defense counsel, Mr. Matthew Mehnert referenced a conversation wherein he and I discussed the service of a Second Amended Complaint. Mr. Mehnert consented to accept service of the Second Amended Complaint and so requested from the Court an extension of Defendants' time to answer or otherwise respond in light of the forthcoming Second Amended Complaint. Mr. Mehnert and I had agreed that Plaintiffs would file their Second Amended Complaint on or before December 31, 2015.

Taking into account Your Honor's Order of December 22, 2015, Plaintiffs request judicial guidance as to how the Court wishes the parties to proceed. With no disrespect intended

to the Court, but in order to comply with the previous agreement made with Mr. Mehnert and all professional courtesies, Plaintiffs have today filed their Second Amended Complaint.

If the Court would prefer the Plaintiffs follow a different course of action, Plaintiffs will obviously conform thereto.

Thank you for your attention to this matter, and we wish all a safe, happy, and healthy New Years' Celebration.

Very truly yours,

DELL & DEAN, PLLC

JON-PAUL GABRIELE
JGabriele@D2TrialLaw.com

CC:     Matthew Mehnert, Esq. (Via ECF)